The defendant Henry Gee answered the bill, admitted that he was the administrator of the late James Gee, and referred for the state of the assets which had come to his hands to the inventory and account of sales which he had returned to court. The answer denied that there was any fraud or mistake in the drafting or execution of the marriage settlement, and insisted that it was perfectly understood before the marriage, and part of the agreement between his intestate and the plaintiff, that he should become entitled as husband to all the moneys due and owing to the plaintiff, which the intestate might receive or reduce into his possession. With respect to the slaves which the bill charged that the defendant's intestate conveyed to David Clark, the defendant denied that the plaintiff has any just claim for compensation. He stated that Marmaduke Norfleet, the first husband of the plaintiff, left him surviving his said widow and five children, and also left a will, and Peyton R. Tunstall was duly appointed his administrator with the will annexed; that the slaves belonging to the estate remained undivided, some of them being hired out by the administrator and the others working on the plantation of their late master, under the superintendence of the administrator, and that the said administrator kept possession of all the other personal property of the said Norfleet until after the intermarriage of the defendant's intestate with the plaintiff; that after the intermarriage *Page 93 
a division was made of the slaves which were of the said Norfleet's estate into five equal shares, of which one was allotted to the defendant's intestate in right of his wife, amounting according to valuation to the sum of $7,320.20; that after the marriage a sale was made by the administrator of the perishable property of his testator, at which (107) sale the defendant's intestate purchased a large amount of stock of various kinds, plantation utensils, furniture, etc., and that he never got into possession or enjoyed any stock, plantation utensils, or furniture whatever which were her property; that several suits having been instituted between the persons interested in the said Norfleet's estate, the entire settlement of the estate was referred to arbitration; that the arbitrators awarded that the defendant's intestate, in right of his wife, was entitled to receive but one-seventh instead of one-fifth of the slaves, and had received an excess on account thereof; that the said intestate had received from the administrator of Marmaduke Norfleet more than his wife's share of the value of the perishable estate of the said Marmaduke, and was indebted to the estate in two sums, because of the use of the slaves and of the money of the estate by his wife before his marriage, making altogether a debt against him of $4,117.43; and thereupon they further awarded that the intestate should pay to Weldon Edwards, in right of his wife Lucy, $1,207.29, and deliver over to David Clark eleven of the slaves he had received under the former erroneous allotments, amounting in value to $2,910. The defendant insisted that as to so much of the value of the said slaves thus transferred to David Clark as corrected the error in the former allotment, the plaintiff could have no claim against her husband's estate, and that as to the residue, he has a just counterclaim by reason of her debts contracted before the marriage, so paid off by these negroes. He also insisted that the plaintiff consented that these debts should thus be paid off, and therefore could not on that account claim compensation.
The defendant further stated that a crop was partially planted by his intestate on the lands of the plaintiff, which was subsequently made by the labor of the slaves of the plaintiff and of his intestate, and had been wholly received by the plaintiff; that the plaintiff also reaped a quantity of wheat which had been previously sown by the intestate, and had applied to her own use a quantity of bacon left by the intestate; also that before his death he had leased out parcels of the land of the plaintiff upon shares of the crop, and that these rents had been received by her since his death; and the defendant claimed to be credited (108) in account therefore. He also insisted that he was entitled to credit for the sum of $750 which his intestate accounted for to the estate of Marmaduke Norfleet because of a slave of that estate sold by his said wife before their intermarriage. The answer further alleged that the *Page 94 
intestate, in right of his wife, caveated the probate in Virginia of the will of one William Hill, her relation; that by the said will all the property of the testator was given away from the plaintiff; that the intestate succeeded in effecting a compromise, by which was secured to the intestate the sum of 1,500 or thereabouts; that about three months before the death of his intestate, when he was about to receive the sum so secured, he was restrained from doing so by an injunction obtained at the instance of the plaintiff upon an allegation of facts wholly groundless, and that in about a week after his death the plaintiff proceeded to Virginia, and upon giving an indemnifying bond, procured and received the said money.
The defendant admitted that his intestate purchased the negro slave Jim back from David Clark, but declared that the purchase was effected with the money of the intestate, and that Charles and Doll were not purchased as substitutes for Jim, but were bought before he purchased Jim, and bought with his proper money.
This answer was replied to generally, and proofs were taken on both sides, the substance of which will be found stated in the opinion of the Court.
On the subject of the alleged error in the marriage settlement the plaintiff has examined but one witness, John H. Edwards. His testimony had been taken twice; the Court has attentively considered both his depositions, and is at a loss to pronounce satisfactorily what is proved by them further than an impression of the witness, founded on conversation with the parties, that the property of
Mrs. Norfleet was to be so settled as to secure the use of it to her (109) intended husband during the marriage. This is very weak testimony to show that the settlement was intended to embrace all the property to which Mrs. Norfleet had claim, as well as that whereof she was possessed. The settlement itself, unless there be clear proof to impeach it for fraud or mistake, is conclusive of the agreement of the parties. There would be no security for property if such solemn instruments could be set aside by vague testimony. Besides, an inference from this "understanding" of the plaintiff's witness is repelled by the testimony of Ann S. Wooten, a witness on the part of the defendant. She, like the witness John H. Edwards, was subscribing witness to the marriage settlement. She resided with the plaintiff at the time of her intermarriage with the defendant's intestate, and deposes that some days before the said marriage was solemnized the plaintiff, speaking of the *Page 95 
settlement, informed her that it was a marriage contract made to please her children, which she did not except to have proved, and "that there was nothing said in the deed concerning the money that was coming to her and the profits of the farm, and he, James Gee, would get it in spite of her children." The Court has no hesitation in declaring that the plaintiff has not made out a case for reforming the deed.
The construction of the deed is not free from difficulty. The bill charges that the property of the plaintiff, therein described as "consisting of lands, slaves, stocks of different kinds, crops, household furniture and farming implements," Was conveyed upon trust for the use of the husband during their joint lives, with remainder to the issue of the marriage, if and in default of issue, then in trust for the plaintiff, or such person as she should appoint. On examining the deed, however, it will be found that after the trust declared for the husband during the joint lives of himself and wife, it proceeds to declare the trusts in the event of one dying, and there then being issue of the marriage. In this event it provides that the said Hannah, if she survive, shall enjoy the profits of the property during her life, and the property itself shall be transferred to the issue. The deed then proceeds to declare the trusts in the event of the plaintiff dying before her husband and leaving no issue, and in that event requires of the trustee to transfer to (110) her husband all the settled property except the land and slaves, and to transfer those unto such person or persons as she shall by writing, in nature of deed or will, appoint. Neither of the events thus specifically provided for has happened, and unless we can collect from the instrument some other indications of a trust, it would follow that no trust has been declared suited to the event which has happened. In such a case equity would follow the law, and hold the husband entitled to all the personal property reduced into possession during the coverture. We think, however, that we can collect from the instrument indications of a trust applicable to the event which has occurred, although it must be confessed that they are not explicit, and arise upon language very inartificial. The deed, after declaring the last mentioned trusts in regard to the land and slaves, proceeds thus: "to the intent that the said lands and slaves may not be at the disposal or subject the control or debts of the said James Gee, her intended husband; and in default of such issue of the intended marriage, and of such limitation or appointment in relation to the said lands and slaves, to the heirs at law of the said Hannah Norfleet." When we consider that these slaves were previously to the settlement her property, and see that any dominion over them by her intended husband, except as to the profits thereof during the marriage, is so sedulously guarded against, and that the ulterior estate in them is limited to her appointees, and, for want of appointment, to "her heirs," and *Page 96 
when we further advert to the recital in the deed that it has been agreed "that the land and slaves, and the profits thereof, after the death of the said Hannah and James, or of whichever of them should first happen to die, in case there should be no issue of the intended marriage, should be at the sole disposal of the said Hannah, notwithstanding her coverture," we feel ourselves justified in declaring that upon the whole instrument an intent appears that the trustees should hold the said lands and slaves, after the death of the husband without issue of the marriage, in trust for the widow. See Tyson v. Tyson, 9 N.C. 472.
(111) We do not feel ourselves authorized to infer such a trust in regard to any other property conveyed by the deed than "land and slaves." The specification of these in the parts of the deed on which we have relied for inferring this trust would seem to exclude the other property. A difficulty might have been raised on the part of the defendant which is waived by the answer, whether the widow's share of the negroes of her deceased husband were conveyed by the deed. In law the property in these slaves, as in all the other chattels of the deceased, was in the administrator. She could not with legal propriety be said to be "possessed" of any of them, but had a right only to claim from the administrator her one-seventh part of the net surplus of the estate in his hands after payment of debts. But as it appears from the case that she had no other slaves, or personal property, except her interest in the estate of her husband, a construction of the deed which would exclude this interest wholly from the operation of it would be to render the deed a nullity. The distinction taken by the defendant between her share in the slaves and in the other personal property of her deceased husband seems so reasonable that even if we doubted of its correctness, we should on his admission adopt it. Slaves, though personal chattels, are regarded in our law as imperishable goods, which it is the duty of the executor or administrator to keep and divide in kind between the legatees and the next of kin. An unnecessary sale of slaves would render him liable to them for a devastavit. But with regard to the other personal chattels which deteriorate by time, the case is otherwise. These, except when they have been specifically bequeathed, he is directed to sell, and after payment of debts he accounts for their value to his cestui que trusts. Without much violence of language Mrs. Norfleet might have been considered as possessed of an undivided part of the slaves, as the whole of them were kept together for the purposes of a division in kind, when she could not with propriety be said to have possession of any of the other chattels of her deceased husband, directed by law to be sold, kept by his administrator to be sold, and afterwards actually sold by him in pursuance of his duty. If, therefore, the trust inferred for the plaintiff applied to all the property conveyed by the deed, we think it would not *Page 97 
sustain her claim against the administrator for the money part of her distributive share, because such distributive share (except as to the negroes) did not pass by the deed. (112)
The award referred to in the bill and answer, and all the proceedings upon it, have been exhibited. That award establishes that James Gee and wife were entitled to one-seventh part of the personal estate of the late Marmaduke Norfleet, amounting to $15,629.87; that of this they had already received from the administrator the sum of $12,536.16, leaving a balance due them of $3,093.71, and then awards that they shall take certain slaves of the estate, thereby set apart to them, and valued at the sum of 4,301, and pay the excess of the value of these slaves above the balance so found due, $1,207.29, to Weldon N. Edwards. The award found the whole value of the slaves to be divided, $36,601, of which the one-seventh part was $5,228.71. As we have declared that upon the settlement and in the event that has occurred, a trust did arise for the plaintiff in the undivided share which she was entitled to of the slaves of her first husband's estate, we hold that she should have compensation from the estate of the intestate for the deficiency in the share of the slaves occasioned by reason of advances from the administrator, exceeding her distributive share in those parts of the personal estate which in the event that occurred became the absolute property of defendant's intestate. This difference of value, $927.72, is to be regarded as a debt to her upon the death of her late husband, and not before, since during the marriage he was entitled to all the interest and profits of the settled estate.
We see no other well founded claim of the plaintiff to compensation. The division of slaves made before the awards was altogether erroneous, and was treated by the referees as null. For convenience, indeed, they set apart to the persons respectively entitled to distribution many of the same slaves as had been before allotted to them. But the partition made in the award is a partition of all the slaves. The former is treated as having conferred no rights.
There is no evidence to support the allegations that the slave Jim was bought with her money, or that Charles and Doll were either purchased with her money or as substitutes for Jim. And it follows from what has been already said that she has no claim to compensation (113) because of the furniture and stock purchased by the intestate.
On taking the account, which will become necessary by reason of the compensation herein declared in favor of the plaintiff, the defendant may set off the amount by any just claims which the intestate, or himself as the representative of the intestate, has against the plaintiff. On some of these which have been brought forward in the answer the Court has formed an opinion, and will declare it. *Page 98 
As the Court has put a construction upon the settlement which gives to the intestate in the event that has happened an absolute interest in all the distributive share of his late wife in her former husband's personal estate, except the negroes, and has declared a trust for her in these negroes so that the same should not be affected by his dominion, control, or engagements, and has held the intestate accountable only for the diminution of that trust fund, it follows that the debts of the wife which the intestate paid off do not constitute a credit for him upon the account for compensation. He acquired a large personal estate jure mariti, and he took it subject to the obligations which the law imposed upon him as husband. There is no evidence that the wife made a gift to him of the slaves, or of the balance due her because of the slaves.
The defendant's intestate is entitled to a credit for the value of the emblements received by her, or for the hire of the negroes of the defendant's intestate after his death, and for the value of any of his other personal property converted to her use after his death.
The defendant is not entitled to demand from the plaintiff any part of the rents of the land which became due after the death of the intestate. Equity follows the law, and where a tenant for life leases and dies before rent day, it makes no apportionment of the rent. Jenner v. Morgan, 1 P. Wms., 392; Hay v. Palmer, 3 P. Wms., 501.
The only remaining credit claimed is because of the sum of money stated in the answer to have been secured to the intestate on the compromise of his caveat in Virginia, and received by the plaintiff after (114) his death, under the peculiar circumstances alleged. The facts in relation to this transaction are too imperfectly disclosed to enable us to pronounce upon the validity of this claim. The defendant is at liberty to bring it forward, and show it in full before the commissioner, should he be advised to do so. If the sum of the money was, as the answer avers, secured to be paid to the intestate, we do not see what is to prevent the defendant from reclaiming it from the person who has wrongfully paid it to the plaintiff. Perhaps, however, if the case be so, the defendant may treat it as so much money received by her to his use, as administrator of the intestate. If the money was not secured to be paid to the intestate, but to him and his wife, we should think that the interest in it never vested in the intestate. The Court, however, makes no declaration on this matter, but reserves it for consideration upon the coming up of the report.
An account is directed to be taken of what is due to plaintiff for compensation because of the impaired value of the trust fund at the death of the intestate, and the commissioner is to allow as credits on that account the fair amount of the claims on the part of the defendant, which the Court has recognized as correct in principle, and such others as the *Page 99 
defendant may establish by evidence to the satisfaction of the commissioner to be fair counter-demands against the demand of the plaintiff.
If the parties do not agree as to the assets of the intestate, and anything is found by the commissioner to be due to the plaintiff upon the above account, he must proceed to take also an account of those assets and of the defendant's administration of them.
In conclusion, I would remark that the Court regrets that a case like the present, involving questions worthy of discussion, has been submitted without argument, and express the readiness with which it would listen to an application for a rehearing from either party.
PER CURIAM. Decree accordingly. *Page 101